PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. RAFAEL NÁTER, Defendant and Appellant.

No. 4270. Argued February 10, 1931.—Decided March 3, 1931.

Celestino Iriarte for appellant. R. A. Gómez for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

This is a case of seduction tried by a jury. The defendant was convicted and sentenced to three years in the penitentiary. He has appealed from the judgment and assigned three errors as follows: (1) Lack of jurisdiction in the trial court, as it was not proved that the offense had been committed within its district; (2) lack of evidence of the actual commission of any carnal act; and (3) failure to show that the female had surrendered her virtue on promise of marriage on the part of the defendant.

The evidence is so clear as regards the commission of the offense in the municipal district of Manatí, within the judicial district of Arecibo, and as regards the commission of the carnal act that we will not stop to consider the first two errors. It suffices to say that they are without merit.

The only doubtful question in the appeal is raised by the third assignment of error. The appellant in his brief argues it as follows:

"The testimony of the alleged victim (Record, pp. 3, 4, 5 and 6) shows that the carnal act committed upon her by the defendant, if such an act was committed, was against her will and by overcoming her resistance, as is clearly shown by the following statements:

" ' . . . . . and when reaching a secluded place he shut off the motor, grabbed my arm and violently made me get down.

" 'Q. And when you arrived at the home of your brother-in-law?—A. I complained to him at once, because I did not do it willingly.

" 'Q. Then, you did not do it willingly?—A. I did not.

" 'Q. Was it against your will?—A. Yes, against my will. He forced me to do it.

" 'Q. Did he use violence upon you?—A. He did.

" 'Q. What violence?—A. He raped me by using force.

" 'Q. You did not give in—A. I did not.

" 'Q. You said that he did it three times?—A. Yes.

" 'Q. Always against your will?—A. Always.

" ' .

" 'Q. Did you offer resistance?—A. I did, but he did not stop.

" 'Q. Did you refuse even though he offered to marry you?—A. He said that I had to submit to him and then he would marry me and I refused; that he should rather go away and leave me as I was before.

" 'Q. Did you not surrender to him because he offered to marry you?—A. I did not surrender.'

"Seduction consists in enticing a woman from the path of virtue, and obtaining her consent to illicit intercourse, by promises made at the time. The promise, and yielding her virtue in consequence thereof, is the gist of the offense. Putman v. State, 16 S. W. 97; Spenrath v. State, 48 S. W. 192.

"If prosecutrix Gregoria Rodríguez did not voluntarily submit to the defendant, relying on the promise of marriage required by the statute, but performed the act against her will, overcome by the force and violence of the defendant, then it could be a case of rape and not of seduction."

There is no doubt that in accordance with the historical development of Criminal Law and the language used in our statute, to wit: "Every person who, under promise of marriage, seduces an unmarried female. . . ." (section 261 of the Penal Code), and likewise in accordance with the adjudicated cases, consent of the woman secured under promise of marriage is required. If the woman never consented and the act was committed by force or under any of the other circumstances specified in section 255 of the Penal Code, the offense constitutes rape but not seduction.

Ruling Case Law, resuming the jurisprudence on the matter, says:

"An essential element of the crime of seduction is the consent of the female to the act of intercourse. She must be deemed capable of giving consent if old enough to make a contract to marry, even though her youth may be such that her consent would afford no protection to the accused, if the prosecution were for the crime of rape. An indictment for seduction is not supported by proof that the defendant accomplished his purpose by force, and he is entitled to such an instruction if there is any evidence of force. The offense may constitute some other crime, such as rape or fornication, but it cannot constitute seduction." 24 R.C.L. 763.

The following is from Cyc.:

"In a criminal prosecution for seduction, proof of the use of force making the offense rape will defeat the prosecution . . . . ." 35 Cyc. 1296.

"An indictment for seduction cannot be sustained when the evidence shows that the woman did not consent and force was used, so that the offense was rape. But if consent was in fact obtained, the fact that force was also used, as in the case of slight resistance or reluctance, is immaterial, as a woman cannot be raped with her consent . . . ." 35 Cyc. 1337.

The Texas cases cited by the appellant set forth the jurisprudence on the matter both extensively and thoroughly, but the conclusion reached therein by virtue of the facts and circumstances involved does not favor the appellant. We quote the following headnotes:

"Pen. Code Tex. art. 814, makes it a crime, and prescribes the punishment, if any person shall, 'by promise to marry,' seduce an unmarried female, and have carnal knowledge of her; and article 815 declares that the term 'seduction' is used in the sense in which it is commonly understood. *Held*, that to constitute seduction a man must, in addittion to the promise of marriage, use some other means than a mere appeal to the lust or passion of the woman." 16 S. W. 97.

"Prosecutrix testified that defendant seduced her under a promise of immediate marriage if anything happened to her, but, if not, he would marry her 'some time after Christmas.' She testified to sexual intercourse with him on three other occasions, the first of which was more than a year before, at each of which times she said he had made a general promise to marry her. *Held*, not to constitute seduction." 48 S. W. 192.

From a study of the jurisprudence we find a case in California which points out the path to be followed in deciding the present case. We refer to *People* v. *Wallace*, 109 Cal. 611, 613. The pertinent part of the opinion of the court in that case reads as follows:

"The claim that a case of seduction was not shown because the prosecutrix did not consent to the act, and that it was therefore

rape, if anything, is without merit. It is true the prosecutrix states in terms that she did not consent to the act, but her testimony, taken as a whole, shows that she did, and the jury were justified in so finding. Obviously, what the prosecutrix meant to convey by her testimony was that she did not give her consent in express terms, because she did not think it was right, but that her objections were so far overcome by defendant's solicitations that she yielded a reluctant acquiescence in his act. The jury very properly subordinated the literal terms used by the witness to the substance and effect of her evidence.''

Let us now consider the testimony of the prosecutrix in the light of the above doctrine. If consideration was only given to the passages cited by the appellant he would perhaps be right, but she further testified as follows:

''Q. Do you know this defendant?—A. I do.

''Q. Did you have any relations with him?—Amorous relations during a year and a half.

''Q. Do you mean that he was your lover?—A. My lover.

''Q. Did he make any promise to you?—A. He promised to marry me.

''Q. Did he make the promise to you only?—A. To me and to my father also.

''Q. What happened to you, if anything, with this defendant on the 15th of October of last year?—A. On Tuesday October 15 I was in the house of Antonio Guiordo when Rafael Náter arrived in his car and asked me whether I was going to the Granja, because he was going to take another lady and that he could take me at the same time. When we left town I asked him where were the persons who he told me were going and he answered me that farther on; and on reaching the junction of the Morovis and Vega Baja roads he turned the car towards Manatí.

''    .    .    .    .    .    .    .    .    .    .

''Q. Where did he take you?—A. To the Manatí seashore.

''Q. Tell us all he did to you that day.—A. He took me and when arriving at the ward of Campo Alegre, Manatí, he went on driving his car, but I am not well acquainted with that place and he went through a palm grove, and when reaching a hidden place he shut off the motor and grabbed me by the arm and violently made me get down and we went into a thicket; he cleared the place,

placed his cap on the ground, grabbed me, lifted my clothes, pulled down his and had carnal intercourse with me three times.

"Q. Did he make any offer to you before the commission of the act?—A. He offered to marry me.

"Q. How?—A. On our way there I asked him where he was going, and he replied to the Manatí seashore, because his people did not approve of our friendship and by submitting to him he could marry me, and in spite of all I did he drove on at great speed and did not heed me.

"      .      .      .      .      .      .      .      .      .      .

"Q. Where did he take you?—A. To the house of my brother-in-law.

"A. What did you do on reaching the house of your brother-in-law?—A. I complained to him at once, because it had not been done with my consent.

"Q. Had you ever had sexual intercourse with any other man? —With no other man.

"On examination by attorney Reyes Delgado, she testified:

"Q. Then you did not do it voluntarily?—A. No.

"Q. Was it against your will?—A. Yes, Sir; against my will. He forced me to do it.

"Q. Did he use violence on you?—A. He did.

"Q. What sort of violence?—A. He raped me, because he forced me.

"Q. You did not consent to it?—I did not.

"      .      .      .      .      .      .      .      .      .      .

"Q. Did you say that when reaching the junction of the Morovis-Manatí road he went on towards Manatí?—A. Yes.

"Q. Were you not acquainted with that neighborhood?—A. No.

"Q. Did you protest when he drove towards Manatí?—A. I did; I begged him for his mother's sake not to do it.

"Q. Did you beg him? A. While driving fast he would tell me that I had to submit to him because his family did not approve. I begged him, but he would not listen to me.

"Q. Did he threaten you?—A. He did not.

"      .      .      .      .      .      .      .      .      .      .

"Q. Do you not know where the acts were committed?—A. On the Manatí seashore.

"Q. Where did he alight when arriving there?—A. Facing a thicket in the Manatí seashore.

"Q. Did you both go into it?—A. Yes.

"Q. Did he pull down his clothes and yours?—A. He pulled down mine and his also, on the ground.

"Q. Did you object?—A. I objected, but he paid no attention.

"Q. Were you not willing in spite of his promise of marriage? A. He would tell me that I had to submit to him and then he would marry me, but I was not willing; that I would rather have him go away and leave me as before.

"Q. Did you yield to him because he promised to marry you? A. I did not yield."

Perhaps the prosecuting attorney by means of a few new questions, after the long and skillful cross-examination by the defense, could have brought forth the true mind of the witness. However, it is evident from her testimony, such as it was, that she was not testifying in a guileful manner, and although she repeatedly stated that she did not consent, hers was the natural refusal of a chaste woman who, notwithstanding the fact that the man involved is her lover, knows that the act proposed is sinful and she gradually surrenders, always protesting, each time less strongly, until she finally submits but not without remonstrance, as if urged by a last scruple. Had it been otherwise, had there not been involved the man with whom, for a year and a half previously, she had maintained amorous relations, publicly and with the consent of her father and people, one could not explain her going with him from the car to the place where the act was committed, nor her allowing the defendant there to do as he pleased with her, without protesting more strongly, without refusing more energetically. In the case of another man her behavior would have been different. She testified that he did not threaten her, that his insistent argument was that his people objected to his marrying her and that it was necessary that she should submit to him for him to marry her then; and thus in that undefinable state of consciousness or semi-consciousness, persisting in an opposition that eventually ceases to be such in the face of the strong, determinate

and suggestive insistence of the defendant, she finally submitted to the act demanded of her.

By reason of all the foregoing, we hold that the third and last of the errors assigned was not committed either, and therefore that the judgment appealed from must be affirmed.